IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-11440-GAO |
| | ) |
| CLEAN HARBORS OF BRAINTREE, INC., | ) |
| | ) |
| Defendant. | ) |

CONSENT DECREE

**TABLE OF CONTENTS**

I.       JURISDICTION AND VENUE.................................................................................1

II.      APPLICABILITY ...............................................................................................2

III.     DEFINITIONS ....................................................................................................3

IV.      CIVIL PENALTY ...............................................................................................5

V.       COMPLIANCE REQUIREMENTS .................................................................6

VI.      SUPPLEMENTAL ENVIRONMENTAL PROJECTS ....................................7

VII.     REPORTING REQUIREMENTS.....................................................................9

VIII.    STIPULATED PENALTIES ...........................................................................10

IX.      FORCE MAJEURE ..........................................................................................13

X.       DISPUTE RESOLUTION ...............................................................................15

XI.      EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .......................17

XII.     NOTICES ........................................................................................................18

XIII.    COSTS .............................................................................................................20

XIV.     MODIFICATION .............................................................................................20

XV.      INTEGRATION ...............................................................................................21

XVI.     SIGNATORIES/SERVICE..............................................................................21

XVII.    PUBLIC PARTICIPATION .............................................................................22

XVIII.   EFFECTIVE AND TERMINATION DATES .................................................22

XIX.     RETENTION OF JURISDICTION .................................................................23

XX.      FINAL JUDGMENT........................................................................................23

APPENDIX I - Supplemental Waste Analysis Protocol

APPENDIX II - Phyto-Pollution Reduction Supplemental Environmental Project

APPENDIX III - Aerial Tower Fire Truck Supplemental Environmental Project

WHEREAS, plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint in this action ("Complaint") against Defendant, Clean Harbors of Braintree, Inc. ("Clean Harbors"), alleging that Clean Harbors has committed violations of regulations and permits issued pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, and of regulations issued pursuant to the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. §§ 11001-11050, at Clean Harbors' hazardous waste treatment and storage facility located in Braintree, Massachusetts (the "Facility");

WHEREAS, the United States and Clean Harbors (the "Parties"), without the necessity of trial regarding any issue of fact or law, and without any admission of liability by Clean Harbors, consent to entry of this Consent Decree;

WHEREAS, the Parties agree, and the Court finds, that settlement of this action without adjudication or admission of facts or law is in the public interest and that entry of this Consent Decree without further litigation is an appropriate resolution of the claims alleged in the Complaint;

THEREFORE, it is adjudged, ordered and decreed as follows:

## I.  JURISDICTION AND VENUE

1.   The Court has jurisdiction over the subject matter of this action and over the Parties to this Consent Decree pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), Section 325(c)(4) of EPCRA, 42 U.S.C. § 11045(c)(4), and 28 U.S.C. §§ 1331, 1345 and 1355.

2.   Venue properly lies in this district pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), Section 325(c)(4) of EPCRA, 42 U.S.C. § 11045(c)(4), and 28 U.S.C.§ 1395(a), because Clean Harbors is located in this district, and because the violations alleged in the Complaint

occurred in this district.   For purposes of this Consent Decree, or any action to enforce this

Decree, Clean Harbors consents to the Court's jurisdiction over the claims in the underlying action

and to the Court's in personam jurisdiction over Clean Harbors and consents to venue in this

district.

     3.   Clean Harbors agrees that the Complaint states claims upon which relief can be

granted against Clean Harbors pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928, and Section

325 of EPCRA, 42 U.S.C. § 11045.

     4.   The United States has notified the Commonwealth of Massachusetts of the

commencement of this action, pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

## II.  APPLICABILITY

     5.   The provisions of this Consent Decree shall apply to and be binding upon Clean

Harbors and its successors, assigns, or other entities or persons otherwise bound by law.

     6.   No transfer of ownership or operation of the Facility, whether in compliance with the

procedures of this Paragraph or otherwise, shall relieve Clean Harbors of its obligation to ensure

that the terms of the Decree are implemented.   At least thirty (30) days prior to such transfer,

Clean Harbors shall provide a copy of this Consent Decree to the proposed transferee and shall

simultaneously provide written notice of the prospective transfer, together with a copy of the

proposed written transfer agreement, to the United States in accordance with Section XII (Notices)

of this Consent Decree.   Any attempt to transfer ownership or operation of the Facility without

complying with this Paragraph constitutes a violation of this Decree.

     7.   Clean Harbors shall provide a true copy of this Consent Decree to all officers,

managers, supervisors, and agents whose duties might reasonably include compliance with any

provision of this Decree.   Clean Harbors shall also provide a copy of the Decree to any contractor

retained to perform work required under this Consent Decree, and shall condition any such

contract upon performance of the work in conformity with the terms of the Decree.

8.   In any action to enforce this Consent Decree, Clean Harbors shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.   DEFINITIONS

9.   Terms used in this Consent Decree that are defined in RCRA and EPCRA, or in regulations promulgated pursuant to RCRA or EPCRA, shall have the meanings assigned to them in RCRA or EPCRA, or in such regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.   "Clean Harbors" shall mean Clean Harbors of Braintree, Inc.

b.   "Consent Decree" or "Decree" shall mean this document and all attachments and appendices hereto.

c.   "Day" shall mean a calendar day, unless otherwise specified.

d.   "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

e.   "Facility" shall mean Clean Harbors' hazardous waste treatment and storage facility located in Braintree, Massachusetts.

f.   "Fire Truck SEP" shall mean the Aerial Tower Fire Truck Supplemental Environmental Project required by Appendix III of this Decree.

g.   "Hazardous Waste License 5B" shall mean the RCRA permit issued by the Massachusetts Department of Environmental Protection ("MADEP") to Clean Harbors with respect to the Facility on January 13, 1999, as revised on June 26, 2000, which is currently in effect at the Facility pursuant to 310 C.M.R. §30.821(2).

-3-

h. "Interest," as that term is used in Section IV (Civil Penalty) of this Consent Decree and in Paragraphs 28(b) and 28(c) of this Consent Decree, shall mean interest, accruing from the date of lodging of the Consent Decree, until the date of payment, at the rate set forth at 28 U.S.C. § 1961. In order to determine the applicable interest rate under 28 U.S.C. § 1961 for the payments required by Section IV (Civil Penalty) of this Consent Decree or Paragraphs 28(b) and 28(c) of this Consent Decree, the "date of judgment," as that term is used in 28 U.S.C. § 1961, shall be deemed to be the date of lodging of the Consent Decree. "Interest," as that term is used in Section VIII (Stipulated Penalties) (except Paragraphs 28(b) and 28(c)) of this Consent Decree, shall mean interest, accruing on the date that the stipulated penalty payment was due until the date of payment, at the rate set forth at 28 U.S.C. § 1961. In order to determine the applicable interest rate under 28 U.S.C. § 1961 for late stipulated penalty payments, the "date of judgment," as that term is used in 28 U.S.C. § 1961, shall be deemed to be the date that the stipulated penalty payment was due. All Interest shall be compounded on an annual basis calculated from the date the Interest began to accrue.

i. "Parties" shall mean the United States, on behalf of EPA, and Clean Harbors.

j. "Provide written notice" shall mean, unless otherwise specified, that information and documents shall be transmitted in accordance with the procedures specified in Section XII (Notices) of this Consent Decree.

k. "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

l. "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

m. "SEP Eligible Costs" shall have the meaning set forth in Appendices II and III of this Consent Decree.

-4-

n.   "SEPs" shall mean the Tree SEP and the Fire Truck SEP.

o.   "Tree SEP" shall mean the Phyto-Pollution Reduction Supplemental
Environmental Project required by Appendix II of this Consent Decree.

p.   "United States" shall mean the United States of America, acting on behalf of
EPA.

## IV.   CIVIL PENALTY

10.   Within thirty (30) days of entry of this Consent Decree, Clean Harbors shall pay to the
United States a civil penalty of $650,000 plus Interest.

11.   Clean Harbors shall make the above-described civil penalty payment by Fed Wire
Electronic Funds Transfer ("EFT") in accordance with written instructions to be provided to Clean
Harbors by the Financial Litigation Unit of the United States Attorney's Office for the District of
Massachusetts.   At the time of payment, Clean Harbors shall provide written notice of the
payment via facsimile and mail to the United States in accordance with Section XII (Notices) of
this Consent Decree.   The notice shall contain a copy of the EFT authorization form and the EFT
transaction record, together with a transmittal letter that references the case's civil docket number
and DOJ case number 90-7-1-09439, state that the payment is for the case's civil penalty, and
include an explanation of any Interest included in the payment.   Clean Harbors shall also provide
this notice by e-mail to acctsreceivable.CINWD@epa.gov, and by mail to the U.S. Environmental
Protection Agency, Fines and Penalties, Cincinnati Finance Center, P.O. Box 979077, St. Louis,
MO, 63197-9000.

12.   Clean Harbors certifies that it shall not use any payments made pursuant to this
Section, any payments made pursuant to Section VIII (Stipulated Penalties) of this Consent
Decree, or any expenditures related to the implementation of the Supplemental Environmental
Projects required by Section VI (Supplemental Environmental Project) of this Consent Decree in

-5-

any way as, or in furtherance of, a tax deduction for Clean Harbors, or any of its corporate affiliates, under federal, state or local law.   Clean Harbors specifically waives any confidentiality rights it has with respect to its federal tax returns and return information under 26 U.S.C. § 6103, and on any state or local tax returns, as to the United States for the purpose of ensuring the accuracy of this certification.

## V.  COMPLIANCE REQUIREMENTS

13.   Clean Harbors shall comply at all times with RCRA and EPCRA and all federal and state regulations and permits implementing these statutes, including, but not limited to, the following requirements and provisions:

a.  Waste Determinations: Clean Harbors must conduct hazardous waste determinations in compliance with Section 3002 of RCRA, 42 U.S.C. § 6922, 40 C.F.R. §§ 268.7 and 268.9, 310 C.M.R. 30.302, and Hazardous Waste License 5B, Section I and Attachment II (Waste Analysis Plan).   In addition, Clean Harbors shall comply with the Supplemental Waste Analysis Protocol ("SWAP") attached hereto as Appendix I.   Clean Harbors shall comply with Sections I, II.A and II.B of the SWAP for a period of two years from the date of the Court's entry of the Decree, or until the Commonwealth has issued a revised permit for the Facility with a new Waste Analysis Plan, whichever is later.   Clean Harbors shall comply with Section II.C of the SWAP for a period of two years from the date of the Court's entry of the Decree.

b.  Air Emissions Collection System: Clean Harbors shall operate a collection and treatment system for volatile organic compounds emissions from the flammable material storage tanks at the Facility.   Clean Harbors shall operate such a collection and treatment even though not required to do so by 40 C.F.R. Part 264, Subpart CC.

-6-

## VI.  SUPPLEMENTAL ENVIRONMENTAL PROJECTS

14.  Clean Harbors shall implement the Phtyo-Pollution Reduction Supplemental Environmental Project ("Tree SEP") in accordance with Appendix II to this Consent Decree and the Aerial Tower Fire Truck Supplemental Environmental Project ("Fire Truck SEP") in Accordance with Appendix III of this Consent Decree, which are attached hereto and incorporated into this Decree by reference.   In implementing the Tree SEP, Clean Harbors shall spend not less than $612,500 in SEP Eligible Costs.   In implementing the Fire Truck SEP, Clean Harbors shall spend not less than $450,000 in SEP Eligible Costs.

15.  Clean Harbors is responsible for the satisfactory completion of the SEPs in accordance with the requirements of this Decree.   "Satisfactory completion" means that Clean Harbors shall complete the obligations set forth in Appendices II and III.   Clean Harbors may use contractors or consultants in planning and implementing the SEPs.

16.  With regard to each of the SEPs, Clean Harbors certifies the truth and accuracy of each of the following:

a.  that all cost information provided to EPA in connection with EPA's approval of the SEPs was complete and accurate and represented a fair estimate of the costs necessary to implement the SEPs;

b.  that, as of the date of executing this Decree, Clean Harbors is not required to perform or develop either of the SEPs by any federal, state, or local law or regulation and is not required to perform or develop either of the SEPs by agreement, grant, or as injunctive relief awarded in any other action in any forum;

c.  that the SEPs are not projects that Clean Harbors was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

-7-

        d. that Clean Harbors has not received, and is not negotiating to receive, credit for either of the SEPs in any other enforcement action; and

        e. that Clean Harbors will not receive any reimbursement for any portion of the costs of implementing the SEPs from any other person, except that, with respect to the Fire Truck SEP, the Town of Braintree may contribute a portion of the cost of the fire truck, but Clean Harbors shall be responsible for the acquisition of the fire truck regardless of whether the Town of Braintree makes any contribution toward the cost of the fire truck and shall contribute at least $450,000 in SEP Eligible Costs in connection with the acquisition of the fire truck.

    17. Clean Harbors also certifies that it is not a party to any open federal financial assistance transaction that is funding or could be used to fund the same activity as either of the SEPs. Clean Harbors further certifies that, to the best of its knowledge and belief after reasonable inquiry, there is no such open federal financial transaction that is funding or could be used to fund the same activity as the SEPs, nor has the same activity been described in an unsuccessful federal financial assistance transaction proposal submitted to EPA within two years of the date of this settlement (unless the project was barred from funding as statutorily ineligible). For the purposes of this certification, the term "open federal financial assistance transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan or other mechanism for providing federal financial assistance whose performance period has not yet expired.

    18. After receiving the SEP Completion Reports, as required by Appendices II and III, the United States shall notify Clean Harbors whether or not Clean Harbors has satisfactorily completed the SEPs. If (a) either of the SEPs has not been satisfactorily completed, (b) the amount of SEP Eligible Costs expended by Clean Harbors in connection with the performance of the Tree SEP is less than $612,500, or (c) the amount of SEP Eligible Costs expended by Clean Harbors in connection with the performance of the Fire Truck SEP is less than $450,000, stipulated

penalties may be assessed under Section VIII (Stipulated Penalties) of this Consent Decree.

19.  Disputes concerning the satisfactory performance of the SEPs and the amount of SEP Eligible Costs may be resolved under Section X (Dispute Resolution) of this Consent Decree.   No other disputes arising under this Section shall be subject to Dispute Resolution.

20.  Each submission required under this Section shall be signed by an official with knowledge of the SEP and shall bear the certification language set forth in Paragraph 55 below.

21.  Any public statement, oral or written, in print, film, electronic or other media, made by Clean Harbors that makes reference to either of the SEPs shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, United States v. Clean Harbors of Braintree, Inc. (D. Mass.), taken on behalf of the U.S. Environmental Protection Agency under the Resource Conservation and Recovery Act and the Emergency Planning and Community Right-to-Know Act."

22.  For federal income tax purposes, Clean Harbors agrees that it will neither capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the SEPs.

## VII.  **REPORTING REQUIREMENTS**

23.  Clean Harbors shall provide any reports required by Appendix I (Supplemental Waste Analysis Protocol), Appendix II (Phyto-Pollution Reduction Supplemental Environmental Project), and Appendix III (Aerial Tower Fire Truck Supplemental Environmental Project) of this Consent Decree.

24.  The reporting requirements of this Section do not relieve Clean Harbors of any reporting obligations required by any federal, state, or local law, regulation, permit, or other requirement.

25.  Any information provided by Clean Harbors pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and

as otherwise permitted by law.

## VIII.   STIPULATED PENALTIES

26.   Except as otherwise provided in this Consent Decree, Clean Harbors shall be liable for stipulated penalties as set forth below in this Section.

27.   Late Payment of Civil Penalty: If Clean Harbors fails to timely pay the civil penalty set forth in Section IV (Civil Penalty) of this Consent Decree, Clean Harbors shall be liable for the stipulated penalties set forth below, as well as any unpaid amount and the Interest required by Section IV:

| Days of Failure to Pay | Penalty Per Day |
| --- | --- |
| 1 to 30 days | $ 1,000 |
| 31 days and beyond | $ 2,000 |

28.   Supplemental Environmental Projects

a.   If Clean Harbors fails to timely provide any information or report required pursuant to Section VI (Supplemental Environmental Project) or Appendix II or III of this Consent Decree, Clean Harbors shall be liable for stipulated penalties for each such failure to provide information, as follows:

| Days of Failure to Provide Information | Penalty Per Day |
| --- | --- |
| 1 to 30 days | $ 250 |
| 31 to 60 days | $ 500 |
| 61 days and beyond | $ 1,000 |

b.   If EPA determines that the Tree SEP has not been completed satisfactorily, Clean Harbors shall pay a stipulated penalty to the United States in the amount of $490,000, plus Interest, unless (1) EPA determines that Clean Harbors has made good faith and timely efforts to complete the SEP project and Clean Harbors has certified that it has spent at least $551,250 in SEP Eligible Costs, in which case Clean Harbors shall pay no stipulated penalty, or (2) EPA determines that Clean Harbors has made good faith and timely efforts to complete the SEP but Clean Harbors

has not certified that it has spent at least $551,250 in SEP Eligible Costs, in which case Clean Harbors shall pay a stipulated penalty to the United States in an amount equal to the lesser of (i) 125% of the difference between $612,500 and the amount of SEP Eligible Costs actually incurred and (ii) $490,000, plus Interest on such lesser amount.   If EPA determines that the Tree SEP has been satisfactorily completed, but Clean Harbors spends less than $551,250 in SEP Eligible Costs, a stipulated penalty equal to 110% the difference between $612,500 and the amount of SEP Eligible Costs actually incurred, plus Interest on this amount, shall be paid as a stipulated penalty to the United States.

c. If EPA determines that the Fire Truck SEP has not been completed satisfactorily, Clean Harbors shall pay a stipulated penalty to the United States in the amount of $360,000, plus Interest, unless (1) EPA determines that Clean Harbors has made good faith and timely efforts to complete the SEP project and Clean Harbors has certified that it has spent at least $405,000 in SEP Eligible Costs, in which case Clean Harbors shall pay no stipulated penalty, or (2) EPA determines that Clean Harbors has made good faith and timely efforts to complete the SEP but Clean Harbors has not certified that it has spent at least $405,000 in SEP Eligible Costs, in which case Clean Harbors shall pay a stipulated penalty to the United States in an amount equal to the lesser of (i) 125% of the difference between $450,000 and the amount of SEP Eligible Costs actually incurred and (ii) $360,000, plus Interest on such lesser amount.   If EPA determines that the Fire Truck SEP has been satisfactorily completed, but Clean Harbors spends less than $405,000 in SEP Eligible Costs, a stipulated penalty equal to 110% the difference between $450,000 and the amount of SEP Eligible Costs actually incurred, plus Interest on this amount, shall be paid as a stipulated penalty to the United States.

d. EPA's determinations of whether Defendant has completed the SEPs satisfactorily and whether Clean Harbors has made good faith and timely efforts to implement the

SEPs are subject to the dispute resolution procedures under Section X (Dispute Resolution) of this Consent Decree.

29.  Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.  Stipulated penalties shall accrue regardless of whether the United States notifies Clean Harbors that a violation of this Consent Decree has occurred.

30.  Stipulated penalties shall become due and owing, and shall be paid by Clean Harbors within 30 days of receipt of a written demand for them from the United States.  If any demanded stipulated penalties are not paid in full when due, Clean Harbors shall pay the unpaid penalties and Interest thereon.

31.  The United States, in an unreviewable exercise of its discretion, may reduce or waive stipulated penalties otherwise due it under this Consent Decree.

32.  Clean Harbors shall pay stipulated penalties owing to the United States in the manner set forth, and with the written notices required, by Paragraph 11 above, except that the transmittal letter shall state that the payment is for stipulated penalties and shall specify the violation(s) for which the penalties are being paid.

33.  Stipulated penalties shall continue to accrue as provided in Paragraph 29 above during any dispute resolution for stipulated penalties, including Interest on such penalties, but need not be paid until the following:

a.  If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Clean Harbors shall pay accrued penalties determined to be owing, together with Interest, to the United States within thirty (30) days of the effective date of the agreement or

the receipt of EPA's decision;

      b. If the dispute is appealed to the Court and the United States prevails in whole or in part, Clean Harbors shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) days of receiving the Court's decision or order, except as provided in Subparagraph (c), below;

      c. If any party appeals the Court's decision, Clean Harbors shall pay all accrued penalties determined to be owing, together with Interest, within fifteen (15) days of receiving the final appellate court decision.

    34. The stipulated penalty provisions of this Section shall be in addition to all other rights reserved by the United States pursuant to Section XI (Effect of Settlement/Reservation of Rights) of this Consent Decree.   Nothing in this Section shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek other remedies or sanctions available by virtue of any violation by Clean Harbors of this Consent Decree including, without limitation, the right to seek specific performance of Clean Harbors' SEP obligations under this Consent Decree, or available under the statutes, regulations or permits referenced within this Consent Decree.

## IX.  <u>FORCE MAJEURE</u>

    35. "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes entirely beyond the control of Clean Harbors, or any entity controlled by Clean Harbors, or of Clean Harbors' contractors, that delays or prevents the performance of any obligation of this Consent Decree subject to stipulated penalties despite Clean Harbors' best efforts to perform the obligation. "Best efforts" include using best efforts to anticipate any potential force majeure event and to address the effects of any such event (a) as it is occurring; and (b) after it has occurred, such that the nonperformance is minimized to the greatest extent possible.   Force majeure does not include Clean Harbors' financial inability to perform the obligations of this

Consent Decree.   Stipulated penalties shall not be due for the number of days of nonperformance caused by a force majeure event as defined in this Paragraph, provided that Clean Harbors complies with the terms of this Section.

36.  If any event occurs that causes or may cause nonperformance of any obligation of this Consent Decree subject to stipulated penalties, whether or not caused by a force majeure event, Clean Harbors shall provide written notice to EPA as soon as possible, but not later than seven (7) days after the time Clean Harbors first knew of the event, or by the exercise of due diligence should have known of the event.   The notice shall describe the nonperformance or expected nonperformance, including its causes and expected duration; describe the measures taken and to be taken by Clean Harbors to prevent or minimize the nonperformance or expected nonperformance; provide a schedule for carrying out those actions; and state Clean Harbors' rationale for attributing any nonperformance or expected nonperformance to a force majeure event.   Failure to provide timely and complete notice in accordance with this Paragraph shall preclude Clean Harbors from asserting any claim of force majeure with respect to the event in question.

37.  If EPA agrees that nonperformance or potential nonperformance of an obligation of this Consent Decree is attributable to force majeure, EPA will notify Clean Harbors of its agreement and the length of the extension granted to perform the obligation.   Stipulated penalties shall not accrue with respect to such obligation during the extension provided by EPA for performance.   An extension of time to perform the obligation affected by a force majeure event shall not, by itself, extend the time to perform any other obligation under this Consent Decree.

38.  If EPA does not agree that a force majeure event has occurred or does not agree to the extension of time sought by Clean Harbors, EPA will notify Clean Harbors in writing of EPA's position, which shall be binding unless Clean Harbors invokes dispute resolution under Section X (Dispute Resolution) of this Consent Decree no later than fifteen (15) days after receipt of EPA's

written notice.   In any such dispute, Clean Harbors shall bear the burden of proving, by a

preponderance of the evidence, that each claimed force majeure event is a force majeure event as

defined by this Section; that Clean Harbors provided the written notice required by Paragraph 36

above; that the force majeure event caused the nonperformance; and that Clean Harbors exercised

its best efforts to prevent or minimize any nonperformance caused by the event.

## X.  DISPUTE RESOLUTION

39.  Unless otherwise provided in this Consent Decree, the dispute resolution procedures

of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect

to this Consent Decree.   However, such procedures shall not apply to actions by the United States

to enforce obligations of Clean Harbors that have not been disputed in accordance with this

Section.

40.  Informal Dispute Resolution: Any dispute subject to dispute resolution under this

Consent Decree shall first be the subject of informal negotiations.   The dispute shall be

considered to have arisen when Clean Harbors provides written notice to EPA describing the

nature of the dispute and requesting informal negotiations to resolve it.   The period of informal

negotiations shall not exceed twenty (20) days beyond the date that EPA receives Clean Harbors'

written notice unless EPA and Clean Harbors agree in writing to a longer period.   If the parties

cannot resolve a dispute by informal negotiations, then the position advanced by EPA shall be

considered binding unless, within fifteen (15) days after the conclusion of the informal negotiation

period, Clean Harbors invokes formal dispute resolution procedures as set forth below.

41.  Formal Dispute Resolution: Clean Harbors shall invoke formal dispute resolution

procedures, within the time period provided in the preceding Paragraph, by providing written

notice to the United States containing a statement of position regarding the matter in dispute.   The

statement of position shall include, but may not be limited to, any factual data, analysis, or opinion

supporting Clean Harbors' position and any supporting documentation relied upon by Clean Harbors.

42. The United States shall provide written notice containing its own statement of position to Clean Harbors within forty-five (45) days of receipt of Clean Harbors' statement of position. The United States' statement of position shall include, but may not be limited to, any factual data, analysis, or opinion supporting that position and all supporting documents relied upon by the United States. The United States' statement of position shall be binding on Clean Harbors, unless Clean Harbors files a motion for judicial review of the dispute in accordance with the following Paragraph.

43. Clean Harbors may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XII (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute. The motion must be filed within ten (10) days of receipt of the United States' statement of position pursuant to the preceding Paragraph. The motion shall contain a written statement of Clean Harbors' position on the matter in dispute, including any supporting factual data, analysis, opinion or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree. Clean Harbors' motion to the Court shall not raise new issues or submit new facts that were not previously presented to the United States during formal dispute resolution.

44. The United States shall respond to Clean Harbors' motion within the time period provided in the local rules of the Court, unless the parties stipulate otherwise. Clean Harbors may file a reply memorandum to the extent permitted by the local rules or the Parties' stipulation, as applicable.

45.  In any judicial proceeding pursuant to this Section's formal dispute resolution procedures, Clean Harbors shall bear the burden of demonstrating that its position clearly complies with, and furthers the objectives of, this Consent Decree and RCRA and/or EPCRA, and that Clean Harbors is entitled to relief under applicable law.   The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law.

46.  The invocation of dispute resolution procedures under this Section shall not extend, postpone, or affect any obligation of Clean Harbors under this Consent Decree not directly in dispute, unless the final resolution of the dispute so dictates.   Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of nonperformance, but payment shall be stayed pending resolution of the dispute as provided in this Section.   If Clean Harbors does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties) of this Consent Decree.

47.  The assessment of stipulated penalties pursuant to Paragraph 27 above regarding Clean Harbors' failure to timely pay its civil penalty shall not be subject to dispute resolution under this Section.   For such assessments, the United States' determination regarding the lateness of the civil penalty and any stipulated penalties assessed as a result shall be unreviewable and final.

## XI.  **EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

48.  This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging of this Consent Decree. This Consent Decree does not limit any rights or remedies available to the United States for any criminal violations.

49.  Except as expressly provided in this Section, this Consent Decree shall not be construed to prevent or limit the rights of the United States to obtain penalties or injunctive relief

-17-

under RCRA or EPCRA, any regulations or permits issued pursuant to RCRA or EPCRA, or any other federal or state laws, regulations, or permits.

50. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations, and in no way relieves Clean Harbors of its responsibility to comply with all applicable federal, state, and local permits, laws and regulations. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Clean Harbors' compliance with any aspect of this Consent Decree will result in compliance with the provisions of RCRA or EPCRA, or with any regulations or permits issued thereunder.

51. This Consent Decree does not limit or affect the rights of Clean Harbors or of the United States against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree against Clean Harbors, except as otherwise provided by law.

52. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

53. Except as expressly provided in this Consent Decree, the United States reserves all legal and equitable remedies available to enforce the provisions of the Decree. The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health, welfare or the environment arising at or posed by Clean Harbors' facilities, whether related to the violations addressed in this Consent Decree or otherwise.

## XII.  NOTICES

54. Unless otherwise specified herein, whenever written notifications, information or reports are required by this Consent Decree, they shall be sent to the individuals and addresses specified below:

<u>As to the United States:</u>

    Chief, Environmental Enforcement Section
    Environment and Natural Resources Division
    U.S. Department of Justice
    P.O. Box 7611
    Washington, D.C. 20044-7611
    Ref: DOJ No. 90-7-1-09439

    Donald G. Frankel
    Senior Counsel
    Environmental Enforcement Section
    Environment and Natural Resources Division
    U.S. Department of Justice
    One Gateway Center
    Suite 616
    Newton, MA 02458

    Andrea Simpson
    Senior Enforcement Counsel
    U.S. Environmental Protection Agency, Region I
    Five Post Office Square, Suite 100
    Mailcode OES04-2
    Boston, Massachusetts 02109-3912

<u>As to Clean Harbors:</u>

    Michael R. McDonald
    Counsel
    Clean Harbors Environmental Services
    42 Longwater Drive
    P.O. Box 9149
    Norwell, MA 02061

    55.  All reports and other written information required by this Consent Decree to be sent by

Clean Harbors to the United States shall contain the following certification:

        I certify under penalty of law that I have examined and am familiar
        with the information submitted in this document and all attachments
        to it, and that this document and its attachments were prepared
        either by me personally or under my direction or supervision in a
        manner designed to ensure that qualified and knowledgeable
        personnel properly gathered and presented the information
        contained therein.   I further certify, based on personal knowledge
        or on my inquiry of those individuals immediately responsible for
        obtaining the information, that the information is true, accurate, and
        complete.   I am aware that there are significant penalties for

submitting false information, including the possibility of fines and imprisonment for knowing and willful submission of a materially false statement.

56. Clean Harbors shall ensure that such certified statement is signed by a responsible corporate officer, such as a president, vice-president, secretary, treasurer, senior manager responsible for environmental policy making and decision making, or other person responsible for a principal business function.

57. Notices made pursuant to this Section shall be deemed provided upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIII.   COSTS

58. Each party shall bear its own costs, disbursements and attorneys' fees in this action, and specifically waives any right to recover such costs, disbursements or attorney's fees from the other party pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, or other applicable law. However, the United States shall be entitled to collect its costs, disbursements and attorneys' fees incurred in any action necessary to collect any outstanding penalties due under this Consent Decree or to otherwise enforce the Decree.

## XIV.   MODIFICATION

59. The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties.   Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

60. Any disputes concerning modification of this Decree shall be resolved pursuant to Section X (Dispute Resolution) of this Consent Decree, provided, however, that instead of the burden of proof provided by Paragraph 45 above, the party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XV.  INTEGRATION

61.  This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.   No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XVI.  SIGNATORIES/SERVICE

62.  Each party certifies that at least one of their undersigned representatives is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such party to this document.

63.  This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

64.  Clean Harbors agrees to accept service of process by mail with respect to all matters arising under this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable local rules of this Court including, but not limited to, service of a summons.   Clean Harbors agrees that the following agent is authorized to accept the above-described service of process on Clean Harbors' behalf:

David Musselman
General Counsel
Clean Harbors Environmental Services
42 Longwater Drive
P.O. Box 9149
Norwell, MA 02061

Clean Harbors shall notify the United States as specified in Section XII (Notices) of this Consent Decree of any change in the identity or address of Clean Harbors, its agent for service, or its counsel.

## XVII.   PUBLIC PARTICIPATION

65.  This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment in accordance with 28 C.F.R. § 50.7.   The United States reserves the right to withdraw or withhold its consent if, upon consideration of any comments received regarding the Consent Decree, the United States concludes that the Consent Decree is inappropriate, improper, or inadequate.   Clean Harbors consents to entry of the Consent Decree without further notice or proceedings.   Clean Harbors agrees not to withdraw from or oppose the entry of the Decree or to challenge any of the Decree's provisions, unless the United States has notified Clean Harbors in writing that it no longer supports entry of the Decree.

66.  If, for any reason, this Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of either party, and the terms of the agreement may not be used as evidence in any litigation between the parties.

## XVIII.   EFFECTIVE AND TERMINATION DATES

67.  This Consent Decree shall be effective when the Court enters the Consent Decree or grants a motion to approve the Consent Decree.

68.  Clean Harbors may provide the United States with a written request for termination of this Consent Decree after Clean Harbors has (a) maintained compliance with this Consent Decree for a period of two (2) years from the date of the Court's entry of the Decree, or until the Commonwealth has issued a revised permit for the Facility with an updated Waste Analysis Plan, whichever is later, (b) submitted to EPA its SEP Completion Report in accordance with Appendix II of this Consent Decree, and (c) paid the civil penalty and any stipulated penalties required by this Consent Decree.   The request for termination shall state that Clean Harbors has satisfied the above requirements, and shall include any necessary supporting documentation.

69.     Following receipt by the United States of Clean Harbors' request for termination, the Parties shall confer informally concerning the request and any disagreement that the Parties may have as to whether Clean Harbors has satisfactorily complied with the requirements for termination of this Consent Decree.   If the United States agrees that the Consent Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

70.  If the United States does not agree that the Consent Decree may be terminated, Clean Harbors may invoke dispute resolution under Section X (Stipulated Penalties) of this Consent Decree.   However, Clean Harbors shall not seek such dispute resolution until sixty (60) days after service of its request for termination.

## XIX.   RETENTION OF JURISDICTION

71.  The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, or effectuating or enforcing compliance with the terms of this Decree.

## XX.   FINAL JUDGMENT

72.  Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court.

Judgment is hereby entered in accordance with the foregoing Consent Decree this $2^d$ day of July , 2012.

_____
UNITED STATES DISTRICT JUDGE

-23-

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v. Clean Harbors of Braintree, Inc.</u> (D. Mass.).

FOR THE UNITED STATES OF AMERICA:

4/5/12
Date

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

4/10/12
Date

DONALD G. FRANKEL
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
One Gateway Center
Suite 616
Newton, MA 02458
617-450-0442

CARMEN M. ORTIZ
United States Attorney for the
District of Massachusetts

GEORGE B. HENDERSON, II
Assistant United States Attorney
United States Attorney's Office
U.S. Courthouse
One Courthouse Way
Suite 9200
Boston, MA 02210

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v. Clean Harbors of Braintree, Inc.</u> (D. Mass.).

4/5/12
Date

H. CURTIS SPALDING
Regional Administrator
U.S. Environmental Protection Agency
Region I
Five Post Office Square
Boston, Massachusetts 02109-3912

3/29/12
Date

ANDREA SIMPSON
Senior Enforcement Counsel
U.S. Environmental Protection Agency
Region I
Five Post Office Square, Suite 100
Mailcode OES04-2
Boston, Massachusetts 02109-3912

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v. Clean Harbors of Braintree, Inc.</u> (D. Mass.).

FOR SETTLING DEFENDANT CLEAN HARBORS OF BRAINTREE, INC:

3/23/2012
Date

ERIC GERSTENBERG
President
Clean Harbors of Braintree, Inc.
42 Longwater Drive
Norwell, MA 02061

-26-

Appendix I

## SUPPLEMENTAL WASTE ANALYSIS PROTOCOL

I. Pre-qualification Procedures

A. Waste Profile

1.  All wastes (hazardous and non-hazardous) accepted by Clean Harbors of Braintree, Inc. ("Clean Harbors") shall be approved through the pre-qualification process. While generator knowledge is an acceptable means by which a generator may conduct a waste determination, the generator must provide documentation showing the basis for the knowledge used to make such determination. Acceptable knowledge includes, for example: past analysis of the waste, an MSDS for an off-specification commercial chemical product, a description of the process generating the waste and/or a review of the raw materials used in the process generating the waste, or a review of studies conducted on hazardous wastes generated from processes similar to the process that generated the waste. Clean Harbors must have available for review, at the Braintree facility, all supporting documentation used and provided by the generator to make a determination based on knowledge along with the waste profile (in either hard copy or available via computer database).   The facility's operating record shall contain documentation that clearly demonstrates that the information relied upon is current and sufficient to identify the waste accurately and completely.   For purposes of this document, the "facility's operating record" shall include, but shall not be limited to, information in Clean Harbors' Waste Information Network (WIN) electronic database.

2.  When analytical data is provided by the generator in the pre-acceptance evaluation process, the Clean Harbors quality control and quality assurance (QA/QC) program shall be used to evaluate the acceptability of that data.   Analytical data needed for the pre-acceptance evaluation may either be provided by the generator or by Clean Harbors. Clean Harbors shall perform verifying analysis or resolve outstanding issues with the generator, if Clean Harbors has reason to believe that the analytical data provided by the generator is inadequate or incorrect.

3.  Generator waste profiles shall be updated as necessary to ensure that they are accurate. At a minimum, these waste profiles shall be updated annually.   In addition, the waste profile shall be updated when Clean Harbors becomes aware that the generator's process or operation generating the waste has changed, or when the results of the on-site acceptance/waste receiving procedures indicate that the hazardous waste received by Clean Harbors does not match the designated waste profile on record.   This profile update shall be documented in the facility's file for each waste profile.

4.  For waste generated by Clean Harbors, Clean Harbors shall update its waste profile, at a minimum, annually.   In addition, Clean Harbors shall update its waste profile when Clean Harbors' waste generation processes or operations change.   This profile update shall be documented in the facility's file for each waste profile.

5.  The waste profile must be reviewed to determine the presence or absence of waste prohibited from acceptance at Clean Harbors.

6.  For purposes of this protocol, "containerized" waste means waste managed in containers that can be moved manually or with a forklift (e.g., U.S. DOT approved shipping containers, drums, pails, bags, boxes, pallets, ton sacks, flasks, and cylinders).

7.  For each EPA hazardous waste code identified by the generator on the waste profile for each waste stream, the generator must indicate if the constituent(s) contained therein are subject to the land disposal restrictions listed in 40 C.F.R. Part 268 for the waste code listed.   The generator must provide chemical analysis or adequate documentation of generator knowledge of the applicability of the standards.

II.  On-site Acceptance/Waste Receiving Procedures

The on-site acceptance/waste receiving process shall include a three-tiered sampling and analysis procedure.

A.  Level I Analysis

1.  All wastes (hazardous and non-hazardous) accepted by Clean Harbors in containers and bulk shipments shall be sampled and analyzed according to the following procedure. All containers shall be opened to visually confirm that the consistency of the waste is the same as that described in the waste profile.   Clean Harbors shall sample all containers received at the facility.   (Clean Harbors need not sample containers that are not capable of being sampled, such as containers containing batteries, CRTs, lamps, lab packs, and empty containers).   When multiple containers of the same waste stream from the same generator are received, samples from every group of four containers will be composited to create a single sample for Level I testing.   If a discrepancy between the waste received and the information on the waste profile is identified that would result in a change in regulatory status, land disposal restriction notification, or D.O.T. shipping name ("non-conforming"), each individual container included in the composite sample will be analyzed separately to identify the non-conforming container(s).   When multiple containers of the same waste from the same generator are received, if the visual inspection of the containers is non-conforming to the waste profile, each individual container that is part of the same waste stream shall be sampled and analyzed in accordance with Level I procedures.   Each bulk shipment shall be opened to visually confirm the consistency of the waste.   Each bulk shipment shall be sampled and analyzed.

Each sample shall be analyzed for all parameters below unless it is not feasible to measure the particular waste stream for a particular parameter or unless the waste profile already indicates that the test for a particular parameter would yield a positive result:

-Physical state and the presence of free liquid
-pH (using pH test paper and, where pH test paper indicates that the waste profile may improperly characterize the waste, using a pH meter)
-VOC screening using a flame ionization detector (FID) or, when use of an FID is not feasible due to extreme cold weather conditions or excessively high humidity, using a photo ionization detector (PID) with a 10.2 eV bulb.  To conduct this screening, a sample will be taken from each container or bulk shipment and placed in a VOA sample vial/jar and immediately sealed.  The sample will include all phases of the wastes in the container/bulk transport unit.  The sample container will be shaken for 10 – 15 seconds and then be allowed to reach equilibrium.  The sample shall be allowed to sit for at least three minutes between shaking and headspace analysis.  The headspace in the sample container will be analyzed for the presence of volatile organics.
-Ignitability Screen (using the test method specified in Appendix C-1 of Clean Harbors' current RCRA permit)
-Water Reactivity (using the test method specified in Appendix C-1 of Clean Harbors' current RCRA permit)
-Reactive Sulfide Spot Test (using the test method specified in Appendix C-1 of Clean Harbors' current RCRA permit)
-Reactive Cyanide Spot Test (using the test method specified in Appendix C-1 of Clean Harbors' current RCRA permit)
-Oxidizer Screen (using the test method specified in Attachment 1 to this document)
-PCB Analysis for waste from utility companies and all wastes to be blended into a tank (using EPA Test Method 8082A or EPA Test Method 600/4-81-0415)
-Radiation Screen

2.  The analytical results shall be compared to the waste profile and other relevant documents and documented in a log in the facility's operating record.  If the Level I analysis identifies a discrepancy between the waste received and the information on the waste profile that would result in a change in regulatory status, land disposal restriction notification, or D.O.T. shipping name, Clean Harbors shall contact the generator and attempt to resolve the discrepancy in a timely manner.  If the discrepancy can not be resolved by the generator, Clean Harbors shall follow the Level II procedure below or reject the shipment.  Any discrepancy and the resolution of the discrepancy shall be documented in the facility's operating records.

B.  Level II Analysis

1.  Clean Harbors shall perform Level II analysis of the waste if required by Section II.A above.  In addition to Level I analysis and documenting the physical description of the waste, each sample shall be analyzed for all parameters below unless it is not feasible to measure the particular waste stream for a particular parameter:

> -VOC analysis (Method 8260)
> -RCRA 8 Metals (TCLP or total metals, as appropriate)
> -Flashpoint (Pensky-Martens)
> -PCB analysis (EPA Test Method 8082A or EPA Test Method 600/4-81-0415)
> - Any other parameter deemed necessary by Clean Harbors to adequately characterize the waste

2.  Level II analysis shall be performed by a National Environmental Laboratory Accreditation Conference (NELAC) certified laboratory.[1]   Results of Level II analysis shall be documented in a log as part of the facility's operating record.

3.  If Level II analysis confirms a discrepancy with the generator's waste profile, Clean Harbors shall either reject the shipment or file a manifest discrepancy report (if applicable) and manage the waste in accordance with the appropriate waste codes.   In addition, Clean Harbors shall evaluate the reason for the discrepancy.   If the discrepancy was caused by a systematic error used by the generator to classify the waste, Clean Harbors shall review all of the profiles submitted by that generator that used the same methodology.   The review shall check for similar errors according to the pre-acceptance procedures outlined above.

C.  Level III Analysis

1. The purpose of Level III analysis is to monitor the effectiveness of the pre-acceptance and acceptance procedures.   Clean Harbors shall select and analyze waste samples received at the facility as follows:

The contents of one out of every 400 containers of waste (including hazardous and non-hazardous waste) received shall be sampled and tested according to Level III analysis procedures.   In the event that the 400th container cannot be sampled (e.g., batteries, CRTs, lamps, lab packs, empty, etc.), or is verified to be either an unused "product" material (MSDS available) or household hazardous waste, Clean Harbors shall count forward (i.e., 401st, 402nd, etc.) until a container of waste is identified that can be sampled.   With respect

---

[1]All analytical tests must be performed in accordance with published test methods and QA/QC procedures by properly trained personnel.   If Clean Harbors is able to meet these standards, it may perform these analyses in house without having NELAC certification.

to tanker trucks and roll-off boxes/containers, one out of every 50 shall be sampled.   In a truck with more than one compartment, every compartment shall be sampled and analyzed separately.   Clean Harbors shall segregate and hold bulk shipments undergoing Level III analysis in dedicated tanks or roll offs while awaiting the analytical results.   Selection of the 50th load will be predicated on the availability of segregated bulk storage capacity at the facility.   If segregated storage equipment for the 50th bulk waste stream is not available, Clean Harbors shall count forward (i.e., 51st, 52nd, etc.) until receipt of a bulk load of waste that can be segregated until analytical results are returned.   Clean Harbors shall use best efforts to ensure that segregated bulk storage capacity is available at the facility to hold shipments of at least 4000 gallons.

In addition to the Level I analysis and documenting the physical description of the waste, each sample shall be analyzed for all parameters below unless it is not feasible to measure the particular waste stream for a particular parameter:

> -VOC analysis (Method 8260)
> -RCRA 8 Metals (TCLP or total metals as appropriate)
> -Flashpoint (Pensky-Martens)
> -PCB analysis (EPA Test Method 8082A or EPA Test Method 600/4-81-0415)

2.   Level I analysis does not have to be repeated if conducted earlier as part of the acceptance protocols.

3.   If the analytical results indicate that the generator of the bulk shipment failed to properly identify the waste, Clean Harbors shall contact the generator and attempt to resolve the discrepancy in a timely manner.   If the discrepancy cannot be resolved by the generator, Clean Harbors shall either reject the shipment or file a manifest discrepancy report (if applicable) and manage the waste in accordance with the appropriate waste codes.   Any discrepancy and the resolution of the discrepancy shall be documented in the facility's operating records.

5

4.   Level III analysis shall be performed by a National Environmental Laboratory Accreditation Conference (NELAC) certified laboratory.[2]   Results of Level III analysis shall be documented in a log as part of the facility's operating record.

5.   If Level III analysis reveals a discrepancy with the generator's waste profile, then Clean Harbors shall investigate and determine the reason for the discrepancy.   If the cause of the discrepancy was a systematic classification method used for this and other profiles, then all of the profiles using the same methodology submitted by that generator shall be reviewed for accuracy according to the pre-acceptance procedures outlined above.   In addition, Clean Harbors shall amend the pre-acceptance and acceptance procedures as necessary, and document this information.

---

[2]All analytical procedures must be performed in accordance with published test methods and QA\QC procedures by properly trained personnel.   If Clean Harbors is able to meet these standards, it may perform these analyses in house without having NELAC certification.

**ATTACHMENT 1-Level 1 Test Method for Oxidizer Screen**

<u>Liquids and Sludges</u>
A strip of KI-Starch paper is wetted with hydrochloric acid.   The wetted strip is dipped into the sample.   If the color turns light brown to dark purple or black, the result is interpreted as positive, and the waste is managed as an oxidizer.   The color is indicative of the type of oxidizer present.

<u>Solids</u>
2 mL of deionized water is added to 11 grams of sample.   The mixture is then stirred for 30 seconds.   A strip of KI-starch paper is wetted in hydrochloric acid and then dipped into the slurry.   If the color turns light brown to dark purple or black, then the result is interpreted as positive and the waste is managed as an oxidizer.   The light brown color is indicative of nitric acid.   A purple/black color results from the presence of peroxides.

**Appendix II**

**PHYTO-POLLUTION REDUCTION SUPPLEMENTAL ENVIRONMENTAL PROJECT**

1. Purpose of SEP

    The purpose of this Phyto-Pollution Reduction Supplemental Environmental Project ("SEP") is to improve air quality and achieve other environmental benefits in certain potential environmental justice areas in the City of Boston ("Boston EJ Areas") through the planting of trees in those areas.   The environmental benefits are expected to include, among others, the reduction of ozone, nitrogen dioxide, sulfur dioxide, and particulates, as well as the generation of oxygen, resulting in improved air quality; and the reduction of carbon dioxide, a greenhouse gas, and associated carbon sequestration.   The SEP is expected to supplement the number of trees that would normally be planted in the Boston EJ Areas by the City of Boston using its own funds.   It is therefore expected that the City of Boston will not reduce the amount of its own funds expended for tree planting in the Boston EJ Areas as a result of the SEP.

2. Scope of SEP

    a.   Clean Harbors of Braintree, Inc. ("Clean Harbors") shall ensure that approximately 800 trees are planted in the Boston EJ Areas, which shall include all of the Potential Environmental Justice (EJ) Areas shown on the attached map (in yellow, blue or green), except for the area that is eligible for federal funding under the September, 2011 Choice Neighborhoods Initiative HUD grant provided to the City of Boston, i.e., the approximately one-half square mile area centered on Quincy Street and bounded by Blue Hill Avenue on the West, East and West Cottage Streets on the North, the Fairmount Commuter Rail Line and Columbia Road on the East, and Washington Street on the South.   The trees shall be placed in existing wells in sidewalk locations.   The trees shall be one of the species on the attached list and shall be pre-approved by the City of Boston Parks and Recreation Department ("Boston Parks Department").   The trees shall be at least 2.5 caliper and at least 8 feet in height at the time of planting, unless the Boston Parks Department approves a smaller size.   Clean Harbors shall ensure that the trees planted under this SEP are covered by a warranty of at least two years and are inspected pursuant to the Boston Parks Department contracted tree planting specifications during the two-year period.

    b.   Clean Harbors may enter into an agreement with the City of Boston or The Fund for Parks and Recreation in Boston ("Parks Fund") in connection with the management or implementation of this SEP, which may use their own contractors to implement this SEP. However, Clean Harbors shall have the ultimate responsibility for successful completion of this SEP.

    c.   In implementing this SEP, Clean Harbors shall expend not less than $612,500 in SEP Eligible Costs.   SEP Eligible Costs shall include only amounts paid to contractors for the planting of trees pursuant to this SEP or for work directly related to such planting (such as sidewalk preparation, soil preparation, staking, etc.).   SEP Eligible Costs shall not include any administrative costs incurred by Clean Harbors, the City of Boston, or the Parks Fund in connection with this SEP or otherwise.

3. Project Schedule

 The SEP shall be implemented in three phases:

 Phase 1: Approximately 280 trees shall be planted during the fall of 2012.

 Phase 2: Approximately 280 trees shall be planted during the spring of 2013.

 Phase 3: Approximately 240 trees shall be planted during the fall of 2013.

The phasing set forth above may be revised to account for the availability of trees and other factors, as long as the approximately 800 trees are planted by December 21, 2013.

4. SEP Reports

 a.  By February 1, 2013 and August 1, 2013, Clean Harbors shall submit to EPA reports identifying the locations of the trees planted, the species of trees planted, and an itemization of the SEP Eligible Costs incurred during the prior planting season.   In addition, the reports shall discuss any problems encountered in performing the SEP and proposed solutions thereto.

 b.  By February 1, 2014, Clean Harbors shall submit a SEP Completion Report identifying the locations of all of the trees planted, the species of all of the trees planted, an itemization of the SEP Eligible Costs incurred (including backup documentation), an identification of any trees that needed to be replaced during the warranty period as of the date of the report, and the environmental benefits achieved as a result of the SEP.   EPA may, in its sole discretion, require information in addition to that described above reasonably necessary to determine the adequacy of SEP completion or the eligibility of SEP costs, and Clean Harbors shall provide such information.

 c.  Clean Harbors shall submit a supplemental report, by February 1, 2016, identifying any additional trees that needed to be replaced during the warranty period.



Boston, Massachusetts
Potential Environmental Justice Areas

Potential Environmental Justice (EJ) Areas

Low-Income

Minority

Both

Unpopulated

About Potential Environmental Justice Areas

The Region's Potential Environmental Justice (EJ) Areas are based on the 2000 Census Block Group Boundary layer. The methodology used to determine how the areas are coded involved identifying those block groups with percentages in the top 15% of the region for low-income residents and/or minorities. Low-income is defined as twice the Federal Poverty Level.

| List of Acceptable Tree Species | |
|---|---|
| **Scientific Name** | **Common Name** |
| Acer plantoides | Norway maple |
| Tilia cordata | Littleleaf linden |
| Gleditsia triacanthos var. inermis | Honey locust |
| Pyrus calleryana | Callery pear |
| Fraxinus pennsylvanica | Green ash |
| Acer rubrum | Red maple |
| Plantanus acerifolia | London planetree |
| Quercus rubra | Red oak |
| Zelkova serrata | Japanese zelkova |
| Prunus, spp. | Cherry |
| Ginkgo biloba (male) | Ginkgo |
| Syringa reticulata | Japanese tree lilac |
| Quercus palustris | Pin oak |
| Malus, spp. | Crabapple |
| Acer campestre | Hedge maple |
| Tilia tomentosa | Silver linden |
| Sophorica japonica | Japanese pagoda |
| Liquidambar styraciflua | Sweetgum |
| Platanus occidentalis | American sycamore |
| Acer saccharinum | Silver maple |
| Fraxinus americana | White ash |
| Tilia americana | American linden |
| Ulmus americana | American elm |
| Acer saccharum | Sugar maple |
| Ulmus, spp. | Elm hybrid |

Appendix III

## AERIAL PLATFORM FIRE TRUCK SUPPLEMENTAL ENVIRONMENTAL PROJECT

1.  Purpose of SEP

The purpose of this Aerial Platform Fire Truck Supplemental Environmental Project ("SEP") is to improve the ability of the Town of Braintree ("Braintree") to respond to fires and explosions, especially at locations where hazardous materials are located, such as the hazardous waste facility operated by Clean Harbors of Braintree, Inc. ("Clean Harbors") in Braintree, thereby reducing the risk to the public and to firefighters resulting from such fires and explosions. This purpose will be achieved through the acquisition of an aerial platform fire truck, to be owned and operated by Braintree which, when compared to the fire trucks currently owned by Braintree, will have a superior ability to effectively and safely respond to such fires and explosions.

2.  Scope of SEP

Within one year of the date of entry of the Consent Decree, Clean Harbors shall acquire on behalf of Braintree, or cause to be acquired on behalf of Braintree, a new E-One 95-Platform fire truck, described in Exhibit A hereto, or a substantially similar fire truck. The fire truck shall be equipped with the following hazardous materials response equipment, which is specifically suited for responding to incidents at chemical storage facilities, such as the Clean Harbors hazardous waste facility in Braintree: portable containment pool for decontamination, spill kit, storm drain seals, absorbent for liquid spills, HazMat protective suits, foam concentrate for petroleum-based and alcohol fires, foam delivery system, spill berms for containment of product, and absorbent oil booms/socks/pads. The fire truck shall be owned and operated by Braintree and is expected to be available for emergency response in Braintree and surrounding communities. The total cost of the fire truck shall be not less than $800,000. Braintree may contribute a portion of the cost of the fire truck, but Clean Harbors shall be responsible for the acquisition of the truck regardless of whether Braintree makes any contribution toward the cost of the fire truck and shall contribute at least $450,000 in SEP Eligible Costs in connection with the acquisition of the fire truck. SEP Eligible Costs shall include only amounts paid by Clean Harbors to the vendor of the fire truck, and shall not include any administrative costs incurred by Clean Harbors or Braintree in connection with this SEP or otherwise.

4.  SEP Reports

Within six months of the date of entry of the Consent Decree, Clean Harbors shall submit to EPA a SEP Progress Report setting forth the progress of the SEP to date. Within thirteen months of the date of entry of the Consent Decree, or within one month of acquiring the fire truck, whichever is sooner, Clean Harbors shall submit to EPA a SEP Completion Report that contains the following information: (i) a description of the fire truck acquired, including the model and serial number of the truck and of all equipment included with the truck, as well as a photograph of

the truck, (ii) identification of the manufacturer and vendor of the truck, (iii) the cost of the truck and associated equipment, including copies of the sales contract, invoice and any other sale documents, (iv) the amount of the cost of the fire truck paid by Clean Harbors and, if Braintree contributed to the cost of the fire truck, the amount paid by Braintree, (v) the identification of the Braintree fire station where the truck is located, and (vi) a copy of any agreements entered into by Clean Harbors and Braintree with respect to the acquisition of the fire truck.   EPA may, in its sole discretion, require information in addition to that described above reasonably necessary to determine the adequacy of SEP completion or the eligibility of SEP costs, and Clean Harbors shall provide such information.

EXHIBIT A

# 95 PLATFORM

The 95 Platform performs with industry leading features. Paramount on this list is a narrow stabilizer spread, expansive compartment space, easy-to-use SideStacker hosebed and low maintenance aerial that all combine to provide a reliable hardworking platform. The 95's track record is impeccable and has a high safety margin that others can't offer.



## Highlights:

- Cyclone II chassis with integral torque box frame
- Medium length cab
- 245" wheelbase
- Platform rated at 1,025 lbs. (750 lbs. firefighters and 275 lbs. equipment) dry and 775 lbs. wet (500 lbs. firefighters and 275 lbs. equipment)
- Jack spread of 13'8"
- 300- or 500-gallon water tank
- With pump version available with SideStacker and center hosebed configurations
- Truck company body available
- Overall heights are 11'10" with SideStacker body; 11'10" with no pump/tank body; 12'1" overall height with center hosebed body

**CAD DRAWING**   **REQUEST INFO**





# 95-Platform

E-ONE

SO 000000
LS98 AERIAL BODY
H712 CYCLONE II CHASSIS
L396 95' PLATFORM